UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE<br><br>JAMES L. BENNETT,<br><br>                       Debtor.<br><br>JOSEPH M. CHARTER,<br><br>                       Plaintiff,<br><br>              v.<br><br>JAMES LESTER BENNETT; DAVID M. ALEX;<br>ALEX ENTERPRISES, LLC; and ROGUE<br>FEDERAL CREDIT UNION,<br><br>                       Defendants, | Bankruptcy Case<br>No. 12-60642-tmr7<br><br><br>Adversary Proceeding<br>No. 12-6136-tmr<br><br><br><br><br>MEMORANDUM OPINION |

Debtor/Defendant James L. Bennett (Debtor) filed his Chapter 7 petition on February 24, 2012. Plaintiff herein was appointed trustee. Plaintiff filed the instant adversary proceeding seeking to set aside, under 11 U.S.C. § 548,[1] an April 2010 transfer of 4.97 acres of real property in White City, Oregon, (Tax Lot (**TL**) 901) to co-defendants Alex Enterprises, LLC (**LLC**) and Dr. David Alex (**Alex**). He alleges both actual and constructive fraud. He also seeks to avoid under § 549 any post-petition transfer of Debtor's interest in the LLC. Alex and the LLC have counterclaimed for a declaration as to the parties' rights,

---

[1] Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

MEMORANDUM OPINION-1

alleging Debtor relinquished all of his right, title, and interest in TL 901 and/or the LLC as part of a loan given to Alex in May 2012.

The parties did not insist on a jury trial, admitted this Court has jurisdiction, and agreed to its entry of a final judgment. An order of default was entered against defendant Rogue Federal Credit Union. The matter has been tried and is ripe for decision.

**Facts**:

Beginning in the 1990s Debtor began his plans to develop a commercial tract of land in White City. In 1998, his Pension Plan[2] (**the Plan**) (with Debtor as trustee thereof) purchased for $400,000 an 8.25 acre parcel (TL 900) from White City Steel and Supply, Inc., which financed $200,000 of the purchase price, taking back a 9% note and trust deed on the property. The note was due in full on September 1, 2000. At some point, the Timothy Baker Trust (**Baker)** obtained a 25% interest in TL 900.

In September 1999, the Plan and Alex (along with his wife Marilyn) entered into an agreement to develop a retail shopping center on approximately 6.5 of the 8.25 acre parcel (**the Agreement**). The other 1.75 acres would be developed into a hotel. Under the Agreement, in exchange for $75,000 paid to the Plan, Alex would receive a 25% interest in the entire 8.25 acre parcel. When the parcel was eventually subdivided, Baker would deed his 25% interest in the 6.5 acre parcel to the Plan, and Alex would deed his 25% interest in the 1.75 acre parcel to Baker. Thus, once subdivided, the 1.75 acre property would be owned 50/50 by the Plan and Baker, and the 6.5 acre property would be owned 75/25 by the Plan and Alex respectively.

Under the Agreement, once the properties had been subdivided, and all land use issues resolved, Alex and the Plan would apply for a construction loan, obtain the necessary permits, and enter into an agreement with a mutually-agreed contractor to construct the improvements and perform all other matters necessary to

---

[2] As outlined in the Court's memorandum opinion entered September 3, 2013, reference to Debtor's "Pension Plan" could be somewhat confusing. Debtor had two versions of his retirement plan, and, partially based on findings of prohibited transactions, the Court disqualified Debtor's plan for exemption purposes. In re Bennett, 2013 WL 4716180, at *7 (Bankr. D. Or. Sept. 3, 2013). That prior ruling does not affect the Court's ruling in this matter.

MEMORANDUM OPINION-2

develop, construct, and operate the shopping center. All costs related to the shopping center were to be divided 75% to the Plan and 25% to Alex. Alex confirmed at trial that his 25% commitment was solely for development costs.

The Agreement stated it was binding on Alex's and the Plan's successors. It provided that at the end of three years (i.e., September 20, 2002), should Alex and his wife choose not to continue with the project, the Plan would repurchase their interest for all sums paid by Alex for or directly benefitting the development, plus 12% interest.

Alex's 25% interest in the entire parcel was not actually deeded to him when the Agreement was executed, as originally contemplated. Instead, the 8.25 acre parcel was subdivided in 2000. The 6.5 acres became TLs 900 (.5 acres) and 901 (approximately 6 acres). The remaining 1.75 acres became TL 902. In November 2000, the Plan implemented the Agreement by deeding 25% of TL 901 to Alex.

In October 2000, Debtor and Alex refinanced the original purchase-money loan. The new loan was with Associates Financial Services Co. (**Associates**) for $256,162, to be paid on a 30-year amortization at 13.21% interest. Debtor and Alex gave a trust deed on TL 901 to secure the loan. Although Alex had only committed to development, as opposed to purchase-money, costs, he agreed to be a co-borrower because Debtor was not creditworthy enough alone to qualify for the refinance. However, Debtor orally agreed to reimburse Alex for any advances he made toward the Associates loan and any subsequent refinances, as well as toward the encumbrances on TL 900.

At some point before March 2002, the Associates loan was either refinanced or serviced by Citifinancial. It also appears that another entity, Rogue Investments, obtained a second lien. Alex's advances to these two creditors, and subsequent refinancers, began in April 2002 and are noted on ledgers created by Alex. Through March 11, 2005, the advances totaled $61,443.09. From May 31, 2005, through May 30, 2012, they totaled $95,647.

As noted above, after the subdivide, a .5 acre parcel was all that remained of original TL 900. On September 4, 2003, Debtor conveyed a 25% interest therein to Alex.

// // //

MEMORANDUM OPINION-3

In June 2005, Debtor and Alex refinanced the Associates' loan with Umpqua Bank, borrowing $300,000 at 7.5% interest, and giving back a note and trust deed. The loan required monthly, interest-only payments, with a balloon payment on June 8, 2007. Again, Alex agreed to be a co-borrower because Debtor could not refinance in his own capacity.

On May 3, 2007, Alex deeded his 25% interest in TL 901 to the Plan, leaving the Plan with a 100% interest. The stated consideration was "none." The deed was recorded on May 7, 2007. On that same date, Debtor conveyed his remaining 75% interest in TL 900 to Alex. It appears this was part of plan to exchange Alex's quarter interest in what was to become TL 903 for a 100% interest in TL 900.

A one-acre parcel (TL 903) was then split from TL 901, leaving TL 901 at 4.97 acres. Because of the May 3, 2007 transfer, the Plan owned a 100% interest in TL 903, which in September 2007 it deeded to Debtor. The stated consideration was "0.00."

At some point in mid-2009, Umpqua Bank requested an appraisal of TL 901 from Mark Baird. On July 1, 2009, Baird issued his opinion that as of June 12, 2009, TL 901's fee simple "AS IS" value was $915,000. Ex. 102.

On or about September 22, 2009, Frontgate Properties, LLC (**Frontgate**) obtained judgment against Debtor in Jackson County Circuit Court, Case # 07-4633-L2, for $100,000 plus pre and post-judgment interest. Ex. 8. It appears Frontgate obtained another judgment totaling over $127,000 on August 31, 2010, which appears to have been for attorney's fees and costs. Ex. 111. Debtor appealed one or both of the judgments. However, he did not have the wherewithal to post a supersedeas bond pending appeal, so he asked Alex to do so for him. Alex posted the bond on December 20, 2010. Debtor agreed to hold Alex harmless from any liability incurred as a result of the bond. The letter agreement dated September 17, 2010, between Debtor and Alex related to the posting of the supersedeas bond (Ex. 111) referenced no other obligation or consideration on the part of Debtor.

On December 3, 2009, the Plan deeded TL 901 to Alex. The stated consideration was "[o]ther." On the same day, Debtor transferred TL 903 to Alex. Again, the stated consideration was "[o]ther." Alex testified that Debtor told him these transfers were "in desperation" because Debtor was unable to handle the

MEMORANDUM OPINION-4

expenses of carrying the properties. Debtor advised Alex he was "in bad shape." At trial, Debtor described this testimony as "accurate."

On December 30, 2009, Alex transferred TL 903 back to Debtor. The stated consideration was "$0.00."

On January 29, 2010, Alex deeded TL 901, 25% to himself and 75% to Debtor. The stated consideration was "0.00." This transfer reinstated the originally-intended ownership percentages in TL 901.

On February 3, 2010, Debtor and Alex refinanced the Umpqua Bank loan with Rogue Federal Credit Union (**RFCU**), borrowing $300,000, and giving back a note and trust deed on TL 901. The note was payable at 7.25% interest, in monthly interest-only payments, with a balloon payment due on February 20, 2012.

On February 22, 2010, Debtor signed a personal financial statement for South Valley Bank & Trust, in which he listed his assets at $4,621,500 and his liabilities at $1,642,825, for a positive net worth of $2,978,675, as of February 15, 2010. In this statement, he valued TL 901 at $1,500,000 (with his 75% being valued at $1,125,000), and noted the $300,000 RFCU lien against the entire value. He valued his then 100% ownership interest in TL 903 at $435,000, with $100,000 and $70,000 liens against it.

On March 19, 2010, Alex and Debtor formed the LLC. By a March 22, 2010, resolution [**the Resolution**], Ex. 101, and separate Shareholders Agreement, id., "stock" certificates were issued.[3] Alex was issued 750 shares, and Debtor, 250.[4] Consideration for the shares was "such sums that each party has paid to date or obligated themselves to pay in behalf of said corporation." Id. at 1. Alex and Debtor were elected to the board of directors. Alex was elected managing member, chairman of the board, and treasurer. Debtor was elected secretary. The LLC was to take title to TL 901. It was to assume the existing $300,000 RFCU

---

[3] An Oregon limited liability company's owners are referred to as "members," ORS 63.001(21), who own "membership interests," ORS 63.001(23), rather than "stock." As noted by the "stock" certificates and other assorted references in the LLC's founding documents, the parties at times mistakenly referred to the LLC as a "corporation," and used terminology consistent therewith. See Ex. 101.

[4] The stock certificates' text (as opposed to their title), mistakenly name "Brookside Inn, Inc." as the entity in which the shares were issued.

MEMORANDUM OPINION-5

loan, as well as any liability for property taxes, insurance, etc. In addition, the LLC was to take title to TL 903 (the one acre parcel), subject to the $100,000 and $70,000 liens. The Resolution stated that "[i]ssues such as amounts of money paid by each member were discussed along with, interest rates applicable based on discussions between the parties that have taken place over the previous number of years, obligations such as the [RFCU] loan cited herein above, future development plans, stock ownership based on the foregoing issues, etc." Id. at 2. The parties intended that the LLC act as a holding company for TLs 901 and 903. Alex and Debtor both testified that in light of Alex's advances which Debtor could not then pay back, Alex would be given a bigger share in TL 901. They further agreed that if Alex continued the advances without payback, or conversely, if Debtor subsequently paid sums commensurate with the prior advances, the LLC membership share percentages would be adjusted accordingly. Alex testified this would be easier than continually adjusting the percentages by deeds to the property itself. It was Alex's hope that Debtor could pay back enough to return to the originally-intended 75/25 ownership split, as Alex never intended to be a majority owner.

On April 16, 2010, Debtor and Alex deeded TL 901 to the LLC. The stated consideration was "N/A." The deed was recorded on April 19, 2010. This completed the change of ownership contemplated by the LLC's formation. The practical effect was transfer of a 50% interest in TL 901 to Alex.[5]

On February 4, 2011, Debtor signed another personal financial statement, listing his financial condition as of February 1, 2011. He testified he did not remember to whom he gave this statement. It showed assets of $1,288,765 and liabilities of $1,432,284 for a negative net worth of $143,519. Although he no longer owned TL 903, Debtor included it in this financial statement with a real market value of $119,000, and encumbered by $171,000 in liabilities. He did not list his then 25% interest in the LLC.

At some point in 2012, Alex sought to modify the RFCU loan. As part of the loan review process, RFCU generated a "Loan Request Write-up" on May 24, 2012. The Write-up indicated approval was sought

---

[5] Also on April 16, 2010, and consistent with the Resolution, Debtor deeded his interest in TL 903 to the LLC for a stated consideration of "N/A." Plaintiff does not seek to set aside this transfer, as TL 903 was then fully liened up and has since been foreclosed upon.

MEMORANDUM OPINION-6

to remove Debtor from the loan "as he is no longer an owner or financially supporting this [TL 901] property." Ex. 109. It also noted Debtor "eventually filed bankruptcy and relinquished his interest on the subject property to Dr. Alex. The property is currently owned by Alex Enterprises, LLC, which is 100% owned by Dr. Alex." Id. The loan modification was approved and, on May 31, 2012, loan documents were executed. Debtor was released as an obligated party. Ex. 19. The loan principal was $299,106. Id. The maturity date was extended from February 20, 2012, to June 1, 2017. Id. Interest was lowered from 7.25% to 5%. Id.

In mid-2013, at Alex's request, Rick Frohreich appraised TL 901 at $300,000 "AS IS" market value for the full fee simple, as of May 10, 2013. Ex. 103.

**Purported Transfer of 250 Shares in LLC:**

Avoidability:

The complaint and counterclaim alleged claims relating to Debtor's post-petition transfer of his interest in the LLC.[6] However, the pre-trial order (PTO), which superseded the pleadings, LBR 7016-1 (incorporating LR 16-5(d)), had no such contentions. Thus, one could read the PTO as eliminating those previously alleged claims. That, however, was clearly not the parties' intent, as the subject claims were in fact tried and argued. They, therefore, are still in the case, see FRCP 15(b)(2)[7] (even if not raised by the pleadings, issues tried by the parties' express or implied consent must be treated in all respects as if so raised), and are discussed below.

Alex argues Debtor transferred his remaining 25% interest (250 shares) in the LLC in consideration of Alex's agreement to post the Frontgate appeal bond and become sole obligor on the May 31, 2012, modified RFCU loan. He testified that he met Debtor at RFCU in February 2012, where Debtor paid him $1,000 as reimbursement for an advance on the January 2012 RFCU loan instalment. Alex testified Debtor then advised him he could pay no more and would transfer his remaining 25% interest in the LLC. Debtor

---

[6] The complaint contained a typographical error and referred to the post-petition transfer as occurring in May 2010, instead of 2012. Complaint at ¶ 9.

[7] FRCP 15(b)(2) is incorporated by FRBP 7015.

MEMORANDUM OPINION-7

testified that sometime in 2012 he had a discussion with Nick Parsons, a loan officer at RFCU. He advised Parsons he couldn't make the RFCU loan payments and was therefore relinquishing his interest in the LLC to Alex. This conversation was memorialized in the May 24, 2012, Loan Request Write-up. Alex conceded in closing argument that any transfer of Debtor's interest in the LLC was post-petition. See also Debtor's Amended Schedule B and Statement of Financial Affairs (listing an interest in the LLC as of the Chapter 7 petition date).

In light of the above, as of the Chapter 7 petition filing on February 24, 2012, Debtor had at most an executory agreement with Alex to transfer his 250 shares in the LLC in exchange for unspecified consideration. Assuming such agreement existed, it was ultimately rejected by the estate. § 365(d)(1).[8] At filing, the as-yet-to-be assigned shares came into the estate. Fursman v. Ulrich (In re First Protection, Inc.), 440 B.R. 821, 828-829 (9th Cir. BAP 2010). Assuming arguendo, Debtor orally transferred his 25% interest in the LLC post-petition,[9] the transfer would be subject to Plaintiff's avoiding powers under § 549(a). That section, in pertinent part, makes avoidable, post-petition transfers of estate property that are not authorized under the Code or by the court. Id. at 827-828. Here, neither the Code nor the court authorized the transfer. Further, even if asserted, Alex could not rely on a § 549(c) good faith, no-notice, transferee defense,[10] as that defense is only available to transferees of real property. Id. at 833. Under Oregon law, limited liability interests are personal property. ORS 63.239.

// // //

---

[8] However, no such executory contract appears on Debtor's Schedule G, thus indicating any agreement to transfer the shares was consummated post-petition.

[9] Under ORS 63.249(1), a membership interest in a limited liability company is assignable. The statute does not expressly prohibit oral assignments but defers to any operating agreement. Here, Article 4.05 of the LLC's Shareholder Agreement, Ex. 101, provides that no transfer of "stock" shall be valid as against the LLC except on surrender or cancellation by the certificate therefor, accompanied by an assignment or transfer by the registered owner made either in person or under assignment. Because § 549 operates to avoid the transfer in any event, see discussion below, the Court need not determine whether Article 4.05 prevents an oral assignment.

[10] Alex testified he didn't know about the bankruptcy.

MEMORANDUM OPINION-8

Recovery:

Once a transfer is avoided, § 550(a) allows recovery of the property transferred, here, the LLC shares, or if the court so orders, their value. Here, Plaintiff seeks only the shares. Alex cannot raise a "good faith transferee" defense to their recovery. § 550(b) (excluding initial transferees from the good faith defense). Thus, the Court will declare the Chapter 7 estate owns 250 shares in the LLC, which in turn owns a 100% interest in TL 901.

**Transfer of 50% Interest in TL 901**:

Avoidability:

Plaintiff argues the April 2010 transfer of Debtor's 50% interest in TL 901 is avoidable as being both actually and constructively fraudulent. Section 548(a)(1)(A) allows a trustee to avoid the transfer of an interest of the debtor in property within two years of the petition filing if the debtor made such transfer "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . indebted." Plaintiff has the burden of proof by a preponderance of evidence. Thompson v. Jonovich (In re Food & Fibre Prot., Ltd.), 168 B.R. 408, 418 (Bankr. D. Az. 1994); Waldron v. Huber (In re Huber), 493 B.R. 798, 811 (Bankr. W.D. Wa. 2013); see also Gill v. Stern (In re Stern), 345 F.3d 1036, 1043 (9th Cir. 2003) (preponderance standard applied to trustee's efforts to avoid debtor's transfer of assets into his pension plan as actually and constructively fraudulent under California law). There is no dispute the April 2010 deed was a transfer[11] involving Debtor's property which took place within two years of the petition.[12] That leaves Debtor's intent as the dispositive issue. Proof of a debtor's general intent to defraud present or future creditors (as opposed to a particular creditor) is sufficient. Hasse v. Rainsdon (In re Pringle), 495 B.R. 447, 468 (9th Cir. BAP 2013). Moreover, because § 548(a)(1)(A) is in the disjunctive,

---

[11] Under § 101(54)(D), "transfer" means among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property; or an interest in property."

[12] Although the deed was executed on April 16, 2010, the actual transfer took place when it was recorded on April 19, 2010. § 548(d)(1) ("transfer" made when perfected so as to give transferee prior rights over a subsequent bona fide purchaser from debtor). This date was less than two years prior to the filing date of February 24, 2012.

MEMORANDUM OPINION-9

intent to merely hinder or delay, as opposed to defraud, is sufficient to support a claim. Leonard v. Coolidge (In re Nat'l Audit Def. Network), 367 B.R. 207, 221-222 (Bankr. D. Nev. 2007). Because direct evidence of fraudulent intent is rare, it is most often proven by circumstantial evidence. Hasse, 495 B.R. at 467. The Ninth Circuit Court of Appeals has identified certain circumstantial "badges of fraud" as follows:

> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.

Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 806 (9th Cir. 1994) (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254–1255 (1st Cir. 1991) (emphasis omitted)). Lack of reasonably equivalent consideration is also an indicia. 5 Collier on Bankruptcy ¶ 548.04[1][b][iii] (Alan M. Resnick & Henry J. Sommer eds., 16th ed.).[13] "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." Acequia, 34 F.3d at 806 (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254–1255 (1st Cir. 1991)). Once the trustee establishes indicia of fraud, the burden shifts to the transferee to prove some "legitimate supervening purpose" for the transfer. Id.

Here, when he transferred 50% of TL 901, Debtor was liable on the Frontgate judgment, and no supersedeas bond had yet been posted. While 50% of TL 901 was not all, or substantially all, of his

---

[13] The Bankruptcy Appellate Panel has stated "the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent." Plotkin v. Pomona Valley Imports, Inc. (In re Cohen), 199 B.R. 709, 717 (9th Cir. BAP 1996). This Court does not construe that statement as eliminating the adequacy of consideration as a factor in determining actual fraudulent intent. See ORS 95.230(2)(h)(listing whether reasonably equivalent value was received as a factor in determining actual intent to hinder, delay, or defraud under Oregon's version of the Uniform Fraudulent Transfer Act, which is the state law analog to § 548(a)(1)(A), and which is available to a bankruptcy trustee through § 544(b)). Rather the Court construes Plotkin to simply mean that once actual fraudulent intent is found, either by direct or circumstantial evidence, the amount of consideration received becomes irrelevant to that issue.

MEMORANDUM OPINION-10

property, it was one of Debtor's major assets and a significant hope for future financial benefit. Debtor received less than reasonably equivalent consideration for the transfer.[14] Further, while he was not technically insolvent[15] at the time, (nor did the transfer render him insolvent), his cash-flow was such that he was unable to pay his bills on an ongoing basis.[16] The transfer was to a personal friend with whom he maintained a less than arms-length business relationship, as borne out by the multiple handshake deals he and Alex entered into. Finally, while Debtor relinquished control of the actual 50% interest (and thereby, technical control of the LLC), he nonetheless continued to manage the LLC post-transfer, with little input or interference from Alex. All of these are more than sufficient indicia to shift the burden to co-defendants to adduce "significantly clear" evidence of some "legitimate supervening purpose" for the transfer. Id. Their explanation, that the transfer was intended to pay Alex back for prior advances and other obligations owed, and that formation of the LLC would facilitate what the parties believed would be ever-changing ownership percentages in TL 901, does not carry their burden. In April 2010, with his development plan bogged down

---

[14] [A] party receives reasonably equivalent value if it gets roughly the value it gave . . . ." Hasse, 495 B.R. at 463 (internal quotation omitted). As discussed in the "Recovery" section below, when the value of 50% of TL 901 is compared to the amount of debt Alex deemed satisfied in consideration therefore, the latter, even adding a conservative amount of yet-to-be-determined interest, did not exceed 60% of the former.

[15] "Insolvency" for purposes of § 548, looks to the so-called "balance sheet" test. § 101(32)(A). The best evidence of same is Exhibit 26, Debtor's financial statement to South Valley Bank & Trust as of February 15, 2010, just two months before the transfer. It showed Debtor's net worth at almost $3,000,000. Even conceding likely inflated property values (e.g., TL 901's listed value of $1,500,000), and some omitted debt (e.g., Alex's claim for reimbursement of advances), Debtor was not balance sheet insolvent in mid-April 2010, nor did the transfer of 50% of TL 901 render him so.

[16] Debtor admitted he was in bad financial shape just four and a half months before the subject transfer. He further testified that at the time of the transfer he couldn't pay his bills, which would include the RFCU loan instalments and the Frontgate judgment. It appears this cash-poor condition persisted until he eventually filed bankruptcy. Further, Debtor most likely knew the value of his real estate holdings, which was his main asset base, was deteriorating because of the recession. Finally, at least insofar as the shopping center project, development was at a standstill. No construction financing had been lined up, and no other development activity, such as obtaining the proper permits, was ongoing. Thus, Debtor was a long way from realizing revenue from TL 901.

MEMORANDUM OPINION-11

and cash-flow down to a trickle, Debtor was in an intractable financial predicament. The transfer of 50% of TL 901 was his way of taking care of his friend at his other creditors' expense. The testimony of both Debtor and Alex support this interpretation of Debtor's intent. He knew this transfer, at the least, would hinder or delay collection of other creditors' claims against him.[17] Debtor's testimony to the contrary, or that he did not recall his motivation, was not credible.

Recovery:

As touched on above, to the extent a transfer is avoided, § 550(a)(1) allows a trustee to recover the property transferred, or, if in the court's discretion it is appropriate, the property's value as of the transfer, from the initial transferee or the entity for whose benefit the initial transfer was made. USAA Fed. Sav. Bank v. Thacker (In re Taylor), 599 F.3d 880, 890 (9th Cir. 2010). Recovery of the property's value is appropriate where the value has [since the transfer] been diminished by . . . depreciation." Id. (citing and quoting Rodriguez v. Daimlerchrysler Fin. Servs. Americas LLC (In re Bremer), 408 B.R. 355, 360 (10th Cir. BAP 2009)). Here, it is evident TL 901 has depreciated since the transfer, so much so, that at present there is little or no equity left for the estate. As such, a monetary judgment reflecting value at the time of the transfer is appropriate.

Section 550(a) allows recovery "to the extent that a transfer is avoided under section . . . 548." (emphasis added). Section 548(c) allows a transferee[18] who takes for value and in good faith, the right to claim a lien on or simply retain the property transferred to the extent the transferee gave value.[19] Although

---

[17] Because Plaintiff has prevailed on his claim under § 548(a)(1)(A), the Court need not address his claim for constructive fraud under § 548(a)(1)(B). However, Debtor's financial condition could also well meet constructive fraud's alternative criteria to insolvency set forth in §§ 548(a)(1)(B)(ii)(II-III).

[18] The LLC, not Alex, was the nominal transferee of 50% of TL 901. However, § 101(54)'s definition includes "indirect" transfers. When the substance, as opposed to the form, of the transactions at bar are examined, Alex was an indirect transferee.

[19] Section 548(c) provides in relevant part:

> Except to the extent that a transfer . . . voidable under this section is

(continued...)

MEMORANDUM OPINION-12

Alex did not plead § 548(c) as an affirmative defense, Burkart v. Varma (In re Singh), 2013 WL 5934299, at *3 (Bankr. E.D. Cal. Nov. 4, 2013), Plaintiff's requested judgment, both in correspondence to the Court [Doc. #39], and at trial, included a setoff for the "value" Alex gave. This impliedly admits Alex is entitled to a § 548(c) defense. Thus, in computing the amount of the judgment to be rendered herein, the Court will first determine the value of 50% of TL 901 at the time of the transfer, and then deduct the value given by Alex.

Value of 50% of TL 901 at time of transfer:

"Value" is defined in 548(d)(2)(A) in pertinent part as "[p]roperty, or satisfaction . . . of a present or antecedent debt of the debtor." "Typically, courts equate value with the fair market value of the subject property at the time of the transfer." Joseph v. Madray (In re Brun), 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007).

The substance of the transaction at hand was that Debtor transferred 50% of TL 901 to Alex on April 19, 2010. Plaintiff argues Baird's appraisal, Ex. 102, which valued the entire fee at $915,000 as of June 12, 2009, 10.25 months before the subject transfer, should be the starting point for determining value, from which the Court should deduct .83% per month (10% per year), up to the transfer's date. Defendants agree the starting point is Baird's value, but argue for a higher monthly percentage decline.

Baird used only the sales comparison approach. He recognized the number of comparable sales were limited and that many of his comparables were "dated." Id. at 34. He noted the real estate market was then in a "deep decline," and that he adjusted his seven comparables' values downward at approximately 1.25% per month from January 2008 to the June 12, 2009, appraisal date (i.e., he applied "time adjusted values"). Id. at 35, 38. He also noted that "it is assumed that there will be further value declines for an estimated year or so, but this is highly speculative to prognosticate." Id. At trial, he confirmed his appraisal's prediction,

---

[19](...continued)
  voidable under section 544, 545, or 547 of this title, a transferee . . . of such a
  transfer . . . that takes for value and in good faith has a lien on or may retain
  any interest transferred . . . to the extent that such transferee . . . gave value to
  the debtor in exchange for such transfer . . . .

MEMORANDUM OPINION-13

testifying that values in fact continued to decline into 2012, and that using the 1.25% per month rate until then would not be unreasonable. He testified the rate of decline resembled an inverted bell curve and that values were currently at the bottom of the "U."

Frohreich's appraisal, Ex. 103, completed 24.66 months after the transfer, valued TL 901 at $300,000. Like Baird, he utilized only the sales comparison approach, using six comparable sales ranging from August 11, 2011, to May 31, 2013. Id. at 44. He testified the local real estate market had not yet stabilized, property values were still declining, and the decline was currently, and had been, in the range of 9-16% per year. He noted his comparables had dropped 9.27% to 16.1% per year in value from their listing or prior sales prices. Id. at 49. He thus adjusted the subject property similarly to arrive at $300,000.

Plaintiff's rebuttal witness, Evan Archerd, reviewed Frohreich's appraisal and critiqued the comparable sales, opining that only a couple of the sales were actually comparable to TL 901. He estimated TL 901's current value at $540,000. He testified values dropped an overall 40% from 4th Quarter 2007 to 1st Quarter 2012, equating to an approximate 10% per year decline, although he further testified the decline was not in a straight line.

Because neither of the appraisals value the property as of the transfer date, the Court is, in essence, left to interpolate. Baird would deduct 1.25% ($11,438) per month[20] from $915,000. Frohreich would deduct between 9-16% per year (or .75-1.33% per month). Alternatively, using straight-line depreciation between the two appraisals, TL 901 dropped 67.22% in value over 47 months, which equates to a 1.43% ($13,086) per month decline. However, giving at least some weight to Archerd's critique of Frohreich's value, the straight-line approach loses some reliability.[21]

// // //

---

[20] $915,000 x .0125=$11,438.

[21] In that regard, however, the Court is stopping far short of adopting Archerd's $540,000 as TL 901's current value. Archerd was brought in to rebut Frohreich's testimony/appraisal. He did not perform his own appraisal, or produce a written report of any kind. At best, his testimony goes to the weight to be given Frohreich's testimony. It should not be seen as substantive evidence of value.

MEMORANDUM OPINION-14

The Court, thus, finds the most reliable indicator of depreciation is Baird's 1.25% ($11,438) per month. That percentage is supported by the high end of Frohreich's range and, although possibly flawed, by the actual straight-line. The $11,438 when multiplied by 10.25 months equates to $117,240 depreciation from June 12, 2009, to April 19, 2010, rendering a $797,760 value for TL 901's full fee. From that, the $300,000 RFCU lien will be deducted, rendering a $497,760 equity. Multiplying that amount by the 50% transferred yields a value of $248,880 for the transferred interest.

Alex argues value should be discounted 20% further because a fractional interest (50%) was transferred. "Fractional interest discounts may be necessary to compensate a willing buyer for the lack of control, lack of marketability, illiquidity, and potential partitioning expenses associated with such interests." Brocato v. C.I.R., 1999 WL 1261490, at *6, T.C. Memo. 1999-424 (U.S.Tax Ct. Dec. 29, 1999). However, fractional interest discounts are not a given. Sufficient evidence must be adduced to support them. Stone ex. rel. Stone Trust Agreement v. United States, 2009 WL 766497, at *1, 103 A.F.T.R.2d (RIA) 2009-1379 (9th Cir. Mar. 24, 2009) (not selected for publication in the Federal Reporter). Baird testified he did one residential appraisal sixteen years ago where he gave a 27% discount for a fractional interest, and that his clients ultimately settled with the IRS at a 22% discount. He stated that, although a discount might be warranted here, he was unable to give a rate. Frohreich testified he had appraised properties with multiple owners. He did not, however, say when or how many times he had done so. He testified that sometimes multiple ownership affects value and sometimes it does not. He testified a discount when a minority interest is being sold is often warranted because a prospective purchaser would not have control, and that one typically looks at a "25% plus or minus" adjustment. However, he did not assemble any comparables or statistics concerning the average discount rates of local, or even regional, fractional interest sales, to support his "typical 25%" adjustment. Based on this limited evidence, the Court is unable to apply a discount to the property at bar. Further, even assuming a discount is appropriate, again based on the weak evidence adduced, the Court would merely be speculating as to the appropriate rate.

// // //

// // //

MEMORANDUM OPINION-15

Value Alex Gave Debtor:

The LLC did not give Debtor anything for the 50% interest in TL 901. Rather, Alex gave Debtor value. The Resolution states the consideration for Alex's 750 shares and Debtor's 250 shares was "such sums that each party has paid to date or obligated themselves to pay in behalf of said corporation." Ex. 101 at 1. That phrase frames the value Alex gave the LLC for his 750 shares, 500 of which represented 50% of TL 901.[22] It does not specifically identify what Debtor received. Based on the testimony, the only value given was the advances Alex had made to Debtor or on behalf of Debtor. See § 548(d)(2)(A)(a form of value is satisfaction of antecedent debt).[23] Those unpaid advances total $103,780 (rounded).[24] Contrary to Plaintiff's argument, that amount should not be reduced by 25% based on Alex's pre-transfer interest in TL 901. The advances were all for items in excess of Alex's bargained-for 25%. Most of them were on the refinanced purchase-money loans. While Alex was co-liable thereon, both the original and the ultimate liability fell to Debtor.

The value Alex gave, however, does not include the $53,310.95 in ledgered advances made after the April 19, 2010, transfer. Ex. 110 at 1-2. The promise to pay future advances was not part of the consideration given Debtor in return for the extra 500 shares (i.e., 50% of TL 901). The parties intended (as evidenced by the ledger noting "loan to Bennett," Ex. 110 at 1-2) that Debtor stay obligated to Alex for any such future advances. Further, even if Alex's promise to cover future shortfalls could be seen as consideration for the extra shares, the Court has not been given any support for such a promise or any

---

[22] The other 250 shares represented Alex's prior 25% ownership of TL 901, for which he paid $75,000 and agreed to pay 25% of any future development (not purchase) costs.

[23] If the defendant claims the transfer was in satisfaction of a present or antecedent debt, the bankruptcy court is tasked with determining, under state law principles, whether such a debt (or conversely "claim") existed. Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.), 714 F.3d 1141, 1147 (9th Cir. 2013) (bankruptcy court had power to examine purported loan by shareholder and re-characterize it as equity investment).

[24] From April 26, 2002, through March 11, 2005, Alex advanced $61,443.09. Ex. 110 at 3-4. From May 31, 2005, through April 19, 2010, Alex advanced $42,336.53. Ex. 110 at 1.

MEMORANDUM OPINION-16

measure to quantify it. The proper measure would not be, in retrospect, what Alex actually paid post-transfer. Each advance was treated as its own loan to be repaid by Debtor. They stand independent of the value of Alex's promise to make them. Quantifying a promise to cover shortfalls is somewhat analogous to what a primary borrower might pay to a third party for a guarantee. Alex has provided no figure for that value. In that vein, Alex also argues his original agreement to co-sign the refinanced loans had value. Again, the Court is left with mere speculation as to how to value that agreement, as no concrete evidence has been adduced.[25]

The final "value" issue is whether the amount of debt deemed satisfied included interest. Alex testified that although he did not account for it on the ledgers, he and Debtor orally agreed to 10% interest. He testified that both he and Debtor were aware of the 12% "buy-out" interest in the Agreement, and that he agreed to lower it to 10%.[26] He further testified it was beyond his ability to calculate interest on the ledgers, and that, in any case, it would be impractical to do so because the amounts would constantly change. At trial, he testified he erroneously stated in his deposition that the $61,443 figure for advances through March 11, 2005 (which did not include interest, see n.24 supra), was the maximum amount he would claim. No countervailing evidence on the interest rate issue was adduced. The Court finds Alex's testimony credible, and thus finds the satisfied advances include interest at the 10% rate. That finding, however, puts the Court in a bind. The amount of interest is calculable with precision, but no party has computed same. As there were approximately 60 separate advances from April 26, 2002, through April 19, 2010,[27] the Court neither has the software nor the inclination to compute it. In light thereof, the Court will take the unusual step of re-opening the record to give Alex time to compute the amount of simple interest on the above-referenced

---

[25] The full $300,000 RFCU lien has already been deducted in determining the value of 50% of TL 901.

[26] That the generic subject of interest had been discussed over the years is memorialized in the Resolution. Ex. 101 at 2.

[27] Alex did testify that, with interest, his advances totaled approximately $208,000. However, that amount included both the post-April 19, 2010, advances, and interest thereon, which as discussed above, cannot be included in the "value" figure.

MEMORANDUM OPINION-17

$103,780 in advances, through the April 19, 2010, date of transfer, at 10% per annum. Plaintiff will be given an appropriate response time should he disagree with the computations.

Prejudgment Interest:

At trial, Plaintiff requested an award of prejudgment interest. However, he made no such request in the PTO.[28] Arguably, this failure is dispositive. Byron v. Rajneesh Found. Int'l, 643 F. Supp. 489, 497 (D. Or. 1985). Even were the Court to reach the merits, it would deny an award of prejudgment interest. Such awards are left to the sound discretion of the trial court, governed by considerations of fairness, and awarded when necessary to make the wronged party whole. Acequia, 34 F.3d at 818.

> In bankruptcy proceedings, the courts have traditionally awarded prejudgment interest from the time demand is made or an adversary proceeding is instituted unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment.

Id. at 818-819 (quoting Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.), 4 F.3d 1556, 1566 (10th Cir. 1993)). Here, the amount of the payment was undetermined and highly contested, both as to value of the property transferred and value given by Alex in return therefore. See also Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 742 (1st Cir. 1982) (prejudgment interest award denied where the alleged avoidable transfer "was not liquidated, there was no transfer of a definite sum of cash, and the parties did not and do not agree on the value of what was transferred."). As such, the Court will not award prejudgment interest.

**Conclusion:**

Debtor transferred his 50% interest in TL 901 in April 2010 with actual intent to hinder, delay, or defraud his creditors. The transfer is thus avoidable under § 548(a)(1)(A). The Court will exercise its discretion and award judgment against Alex based on the value of the property transferred, as opposed to ordering the LLC to return the property itself. That value is $248,880. By his submissions, Plaintiff has conceded Alex was a good faith transferee under § 548(c) and is thus, entitled to retain the value he gave to

---

[28] For that matter, Plaintiff did not ask for prejudgment interest in his original or (impermissibly-filed) amended complaint.

MEMORANDUM OPINION-18

Debtor. That value consisted of satisfaction of antecedent debt. That debt includes 10% simple interest from each advance through April 19, 2010.

Alex will have 14 days from entry of this Opinion to file a <u>detailed</u> statement reflecting the interest earned on the advances. A generic statement will be denied summarily. Plaintiff will then have 14 days to file <u>detailed</u> objections to Alex's computations. Again, a generic objection will be overruled summarily. After the response period has run, the Court reserves the right to rule on the record, or alternatively convene a hearing on the amount of interest.

After ruling on that issue, judgment for Plaintiff will be entered on the § 548 claim. The judgment will also include a declaration that the Chapter 7 estate owns 250 shares of the LLC and that any purported post-petition transfer of same is avoided under § 549.

The above constitute the Court's findings of fact and conclusions of law under FRBP 7052. They shall not be separately stated.

*[signature]*

THOMAS M. RENN
Bankruptcy Judge

MEMORANDUM OPINION-19

Case 12-06136-tmr    Doc 45    Filed 01/27/14